## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No.: 14-80081-CR-MIDDLEBROOKS

UNITED STATES OF AMERICA,

    Plaintiff,

v.

PAUL LEWIS SCHUMACK, II,

    Defendant.

_____/

### AMENDED ORDER GRANTING MOTION FOR COMPASSIONATE RELEASE

THIS CAUSE is before the Court upon a Motion for Compassionate Release filed by Defendant Paul Lewis Schumack, II ("Defendant") on May 27, 2020. (DE 884). The Government responded on June 4, 2020. (DE 887). Defendant replied on June 5, 2020. (DE 889). For the following reasons, Defendant's Motion is granted.

### I. BACKGROUND

In the present Motion, Defendant seeks compassionate release to lessen his chances of contracting the COVID-19 virus, which has serious and potentially lethal consequences for individuals of his age and medical background.[1]

On March 17, 2016, Defendant was sentenced to 144 months imprisonment arising out of his participation in a Ponzi scheme. (DE 798). Defendant currently has 69 months remaining of his 144-month sentence, not taking into account the possibility that he may be approved for a re-

---

[1] *See* CDC, *Coronavirus Disease 2019 (COVID-19), People who are at higher risk for severe illness*, March 26, 2020, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.

entry center or half-way house. (DE 884 at 2). Prior to this conviction, Defendant had no criminal history. (DE 884 at 2). In fact, Defendant is a graduate of the United States Military Academy at West Point and served his country in the United States Army, prior to his honorable discharge in 1990. *Id.* As a result of his service, he was later diagnosed with Post Traumatic Stress Disorder. *Id.*

Defendant alleges that, due to his medical history, he is at a heightened risk of suffering severe illness or even death if he contracts the COVID-19 virus. Defendant is currently 62 years old. *Id*. at 13. He suffers from multiple health conditions including cardiovascular problems and hypertension. *Id.* He has undergone multiple surgeries as a result of his cardiovascular issues. *Id.* at 12. Although there are currently no *reported* cases of COVID-19 at FCI Manchester, where Defendant is incarcerated, he still believes he is at risk. *Id.* at 21.

The Government opposes Defendant's release and argues that 1) Defendant has failed to exhaust administrative remedies, 2) Defendant's medical conditions are insufficient to justify compassionate release, and 3) the severity of Defendant's crime renders him ineligible for compassionate release, as evidenced by a number of victim impact statements.

## II.  LEGAL STANDARD

The compassionate release provision of 18 U.S.C. § 3582(c), as amended by the First Step Act of 2018, provides, in pertinent part, that "the court . . . upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons ("BOP") to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . if it finds that extraordinary and compelling reasons warrant such a reduction" and if "such reduction is consistent with applicable policy statements issued by the Sentencing

Commission[.]" 18 U.S.C. § 3582(c)(1)(A)(i); First Step Act of 2018, Pub. L. 115-391, § 603(b), 132 Stat. 5194, 5239. Before granting compassionate release, the Sentencing Commission directs the court to consider whether a defendant poses "a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13.

### III.   DISCUSSION

#### A. Exhaustion of Administrative Remedies

The Government argues that Defendant has failed to exhaust administrative remedies. Defendant disagrees and states that his daughter sent a letter on his behalf on April 1, 2020, thereby commencing the 30-day period after which a compassionate release request can be brought to the Court. The Government does not dispute that this letter was sent, nor does it seem to dispute that, per 28 C.F.R. § 571.61, "[t]he Bureau of Prisons processes a request made by another person on behalf of an inmate in the same manner as an inmate's request." The Government argues, however, that Defendant's daughter only requested that her father be placed on home confinement, but did not request compassionate release.

In response, Defendant notes that his daughter stated in the letter that Defendant "fully qualifies for the terms listed in the First Step Act." (DE 889). Compliance with the First Step Act is a prerequisite to compassionate release. Although Defendant's daughter does not specifically utilize the phrase "compassionate release" in her letter, I find that her reference to the First Step Act in this context was sufficient to begin the 30-day period for purposes of calculating the time for exhaustion of remedies. Defendant's daughter is a lay person, not legal counsel, and her correspondence should be liberally construed. Other courts have reached a similar conclusion. *See e.g. United States v. Taylor*, CR 3:18-282, 2020 WL 2084974, at *1 (M.D. Pa. Apr. 30, 2020) ("Since Taylor is proceeding pro se, and since she did not state the statutory basis for her motion,

3

the court liberally construes her letter motion as also seeking relief pursuant to the CARES Act as well as a motion compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)"). Therefore, I find that Defendant has appropriately exhausted administrative remedies.[2]

In the alternative, I will also consider whether the exhaustion requirement should be waived in this case. Although § 3582(c)(1)(A) plainly imposes an administrative exhaustion requirement, the United States Supreme Court has held that, even in such circumstances, an exception exists where "the interests of the individual weigh heavily against requiring administrative exhaustion." *See McCarthy v. Madigan*, 503 U.S. 140, 146 (1992); *see also Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019) ("Even where exhaustion is seemingly mandated by statute . . . , the requirement is not absolute."). One such exception exists where "requiring resort to the administrative remedy may occasion undue prejudice to subsequent assertion of a court action. Such prejudice may result, for example, from an unreasonable or indefinite timeframe for administrative action." *McCarthy*, 503 U.S. at 146–47 (1992).

"Courts around the country have recognized that the risk of COVID-19 to people held in jails and prisons 'is significantly higher than in the community, both in terms of risk of transmission, exposure, and harm to individuals who become infected.'" *See United States v. Williams,* 2020 WL 1751545, at *2 (N.D. Fla. Apr. 1, 2020) (quoting *Basank v. Decker*, --- F. Supp. 3d ---, 2020 WL 1481503, at *3 (S.D.N.Y. March 26, 2020), and citing *United States v. Harris*, --- F. Supp. 3d ---, 2020 WL 1503444, at ¶ 7 (D.D.C. Mar. 27, 2020)); *United States v. Campagna*, 2020 WL 1489829, at *2 (S.D.N.Y. Mar. 27, 2020); *Castillo v. Barr*, 2020 WL 1502864, at *2 (C.D. Cal. Mar. 27, 2020); *United States v. Kennedy*, 2020 WL 1493481, at *2-3

---

[2] As the Parties dispute whether Defendant's handwritten "Inmate Request to Staff" was ever submitted, and as I have otherwise found that Defendant's daughter's letter satisfied the exhaustion requirement, I do not find it necessary to address this issue.

(E.D. Mich. Mar. 27, 2020); *United States v. Garlock*, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020)). I find that given this unprecedented virus, it would unduly prejudice the Defendant to require him to exhaust administrative remedies. If Defendant were found not to have exhausted administrative remedies, he would have to start over, waiting another 30 days until he could file a renewed motion for compassionate release in this court. Each day that Defendant spends in confinement, he is at a heightened risk of contracting the COVID-19 virus. Delaying a ruling on Defendant's motion until such time as the BOP can consider his circumstances and take action would be unreasonable and would expose Defendant to unnecessary risk. Accordingly, to the extent that Defendant has not exhausted administrative remedies, I still find that it is appropriate to allow him to proceed with this action.

### B. Compassionate Release Based on Defendant's Medical Conditions

I now consider whether Defendant has displayed an extraordinary and compelling reason sufficient to justify release. Application Note 1 of Section 1B1.13 of the Sentencing Guidelines describes "extraordinary and compelling reasons" for release as including certain medical conditions, advanced age, certain family circumstances, or some "other" reason "[a]s determined by the Director of the Bureau of Prisons." The Note specifies that "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover" constitutes an "extraordinary and compelling reason" justifying compassionate release. U.S.S.G. 1B1.13.

Defendant's age and medical conditions place him at increased risk of severe illness if he contracts COVID-19. Defendant suffers from cardiovascular issues and hypertension, two of the

most significant risk factors for COVID-19 related death.[3] Also, Defendant suffers from glaucoma, a condition which can lead to blindness. Defendant's treatment for glaucoma has been suspended as the civilian doctor formerly providing him treatment cannot access the prison during the pandemic-related lockdown. (DE 884 at 13). Therefore, Defendant is not only at risk of contracting COVID-19 while incarcerated, he is also at risk of severely worsening his glaucoma.

The Government argues that "a review of the transcripts of the hearing at which sentence was imposed do not include any discussion of medical issues that pre-date the imposition of sentence." (DE 887 at 9). However, Defendant's Presentence Investigation Report ("PSI") states that Defendant has been diagnosed with heart disease, high blood pressure, and high cholesterol. (PSI ¶¶76-77). Also, per the PSI, Defendant underwent an "atrial flutter ablation" on October 29, 2013 and his stepson believes Defendant suffered from a heart attack. (PSI ¶ 75). The PSI further provides, based on a statement of his wife, that Defendant has "water around his heart which needs to be monitored, in addition to other heart problems . . ." *Id.* Perhaps most significantly, the PSI states that his doctors concluded "there was a high likelihood that he would develop [atrial fibrillation] in the future." *Id.* This prediction appears likely as Defendant has suffered from an atrial flutter while in BOP custody. (DE 884-2). Therefore, I find that, contrary to the Government's argument, there is ample evidence that Defendant has medical conditions which would put him at a heightened risk of a severe reaction to the COVID-19 virus.

As to Defendant's risk of contracting COVID-19 while incarcerated, I recognize that there are no *confirmed* cases of COVID-19 within FCI Manchester. However, as Judge Levy in the

---

[3] *See* Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19), World Health Organization (Feb. 24, 2020), at 12, https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf ("[i]ndividuals at highest risk for severe disease and death include people aged over 60 years and those with underlying conditions such as hypertension [and]cardiovascular disease.").

Eastern District of Michigan recently noted, "[z]ero confirmed COVID-19 cases is not the same thing as zero COVID-19 cases." *U.S. v. Amarrah*, 17-20464, 2020 WL 2220008, at *6 (E.D. Mich. May 7, 2020) (discussing how, due to the lack of universal testing of inmates and staff, the number of reported cases may be far lower than the actual number of cases). Further, conditions within FCI Manchester are such that Defendant would likely be unable to protect himself from infection if the virus were introduced into the prison population. As Defendant's counsel describes it:

> Mr. Schumack is housed in the low-security prison camp at FCI Manchester, where half the camp (about 65 persons) are together at meal times and other times, even during this Covid-19 lockdown. He sleeps in a confined space (cube not a cell) with another inmate, and cannot socially distance from that person. Their bunks are mere feet away from each other and they sleep with their heads in the same direction. The person in the top bunk is only about a foot from the person in the next cube over. While one might intuitively think their confined cubes protect them from exposure to the other inmates, the walls of the cubes are only about five feet tall, meaning other inmates stand, sleep, and breathe above the cube walls, and thus their air is shared with all 64 other inmates on the floor. There are also only eight sinks, six showers, three phones, one drinking fountain, and one computer with a thumb scan for use by all 65 inmates. These common use facilities are not sanitized in between each inmate's use. . . . He is not provided hand sanitizer or Clorox/disinfectants to clean, but he has been issued a bar of soap and a cloth mask which is laundered about once a week.

(DE 884 at 15-16).

The Government does not dispute this description of prison conditions within FCI Manchester. The COVID-19 virus is highly contagious and can be spread even by asymptomatic carriers. The virus is "spread mainly from person-to-person . . . [b]etween people who are in close contact with one another . . . [t]hrough respiratory droplets produced when an infected person coughs or sneezes."[4] In the environment described in Defendant's motion, it would appear to be virtually impossible for Defendant to adequately protect himself against infection.

---

[4] *See CDC, Coronavirus Disease 2019 (COVID-19), How It Spreads*, March 4, 2020, https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html.

I also find that based on the nature of Defendant's crime and his lack of criminal history, he is not a danger to the safety of any other person or to the community. I am persuaded in part by the fact that Defendant's crime was non-violent. I, of course, acknowledge the serious nature of his offense, and recognize that he has inflicted severe financial harm on a great number of individuals, including the individuals who filed victim impact statements. While I sympathize with these individuals, I nonetheless find that, given the serious risk facing Defendant, the factors set forth in 18 U.S.C. § 3553(a) weigh in favor of his release.

It is not clear from Defendant's Motion whether his release plan has been approved by probation. Defendant's daughter states in her letter to BOP that upon release:

> My father will be residing [at] his stepson Chad's house with his wife and three children. . . . It will be a warm and loving environment for him to return to if he is released. My stepbrother's home is within walking distance to my father's church Boca Glades. Living with his family and being close to his place of worship will be a better setting for him than his current living situation. He will be able to receive the proper medical care along with a loving support system.

(DE 884-3). Given this description, I am hopeful that, to the extent a release plan has not been approved already, one can be finalized quickly.

## IV.   CONCLUSION

Based upon the foregoing, and after careful consideration of the Parties' written submissions, the record, and applicable law, I find that it is appropriate to grant Defendant's request for compassionate release. Accordingly, it is hereby

**ORDERED and ADJUDGED** that:

1. Defendant Paul Lewis Schumack II's Motion for Compassionate Release (DE 884) is **GRANTED**.

2. Defendant's sentence is reduced to **TIME SERVED.** Accordingly, he shall no longer be committed to the custody of the Bureau of Prisons, and he **SHALL BE RELEASED FROM CUSTODY**, **EFFECTIVE IMMEDIATELY.**

3. As a special condition of Defendant's compassionate release, pursuant to and as authorized by 18 U.S.C. § 3582(c)(1)(A), Defendant's sentence shall include an additional term of supervised released for the unserved portion of his original term of imprisonment, which is sixty-nine (69) months. As a condition of this special term of supervised release, Defendant shall be placed on home confinement. The U.S. Probation Office shall supervise Defendant's home confinement. The terms of Defendant's home confinement are as follows:

   Home Detention with Electronic Monitoring - The defendant shall participate in the Home Detention Electronic Monitoring Program for a period of **SIXTY-NINE (69) MONTHS**. During this time, the defendant shall remain at his place of residence except for employment, religious observances, medical appointments and other activities approved in advance and provide the U.S. Probation Officer with requested documentation. The defendant shall maintain a telephone at his place of residence without 'call forwarding', 'call waiting', a modem, 'caller ID', or 'call back/call block' services for the above period. The defendant shall wear an electronic monitoring device and follow the electronic monitoring procedures as instructed by the U.S. Probation Officer. The defendant shall pay for the electronic monitoring equipment at the prevailing rate or in accordance with ability to pay.

4. To the extent that Defendant's release plan has not yet been approved by the Probation Office, Defendant's counsel shall work with Probation to create an approved plan of release as quickly as possible. Counsel shall file status reports each week from the date of this order giving a brief summary of all progress made towards creating a compliant plan of release. **It is the court's expectation that finalization of this release plan will not pose an obstacle to Defendant's immediate release from BOP custody.**

5. Upon completion of the 69-month special period of supervised release under home confinement, Defendant shall begin his three-year term of supervised release, as set forth in his original Judgment. (DE 771).

6. All previous conditions imposed in the original judgment and commitment order remain in full force and effect. (DE 771).

7. Upon release from incarceration, effective immediately, Defendant shall self-quarantine for 14 days.

8. Defendant must contact the United States Probation Office within 72 hours of his release.

**SIGNED** in Chambers at West Palm Beach, Florida, this 10th day of June, 2020.

_____
DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE